<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ADNAN ZEQA, | |
| Plaintiff, | No. 21cv10066 (EP) (SDA) |
| v. | **OPINION** |
| THE HANOVER INSURANCE COMPANY, | |
| Defendant. | |

**PADIN, District Judge.**

Plaintiff Adnan Zeqa ("Plaintiff" or "Zeqa") claims that Defendant Hanover Insurance Company ("Defendant" or "Hanover"), his home insurance company, improperly declined to cover the full extent of losses caused by water damage to his home on October 2, 2019 (the "Incident"). Hanover asserts that it provided the appropriate compensation under the applicable insurance policy.

Zeqa alleges breach of an insurance contract (Count I) and bad faith (Count II). D.E. 1-1 ("Complaint" or "Compl."). Hanover moves (a) for partial summary judgment on the bad faith claim only (Count II), (b) to exclude Zeqa's public adjuster expert witness, Kevin Kaufmann, and (c) to limit evidence on certain damages. D.E. 43-2 ("Motion" or "Mot."). The Court will **GRANT in part and DENY in part** the Motion. The Court will **GRANT** summary judgment in favor of Hanover on Count II and will **DISMISS** Count II. Zeqa's public adjuster expert, Kevin Kaufmann, will be **PARTIALLY EXCLUDED**. The Court will **DENY** Hanover's request to limit evidence of certain damages.

I.    BACKGROUND

A.    Factual Background[1]

1.    *The parties and the property*

Zeqa purchased a two-story home and 3 acres of land at 271 Bridges Road, Lincoln Park, New Jersey 07035 (the "Property") in March of 2019 for $310,000.  D.E. 43-8 ("Property Sale Contract") at 3.  Hanover insured the Property under a homeowner's policy.  Def. Facts ¶ 8 (citing D.E. 43-12 (the "Policy") at 5, 6-29, 46-50).

Zeqa's pre-purchase inspection found evidence of pre-existing water damage such as "warped roof sheathing," "excessive moss or algae growth," hardwood floor coverings "curling around edges at the Living Room, Dining Room, and Bedroom," and "evidence of prior water intrusion in the basement."  *Id.* ¶ 5 (citing D.E. 43-10 ("Barnhill Inspection Report") at 5-13, 24-32).[2]  None of these reported conditions were corrected after Zeqa took ownership of the Property.  *Id.* ¶ 7 (citing D.E. 43-11 ("Zeqa Dep.") at 39:3-12, 63:8-13).

---

[1] The facts are drawn from Hanover's Statement of Undisputed Material Facts, D.E. 43-1 ("Def. Facts"), Plaintiff's Responsive Statement of Material Facts, D.E. 46 pp. 7-17 ("Pl. Facts"), and the exhibits referenced in these submissions.  Parties asserting that a fact is (or cannot be) genuinely disputed must support the assertion by evidence in the record or "'showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.'"  *Dor v. TD Bank*, No. 21-cv-18955, 2023 WL 9017558, at *9 (D.N.J. Dec. 29, 2023) (quoting Fed. R. Civ. P. 56(c)(1)).  Local Civil Rule 56.1(a) also mandates a citation to the record where parties disagree with the movant's statement of material facts.  *Id.*  Facts unsupported by citations to record evidence are not considered and responses that do not cite to record evidence are deemed admissions.  *See Vorhies v. Randolph Township Bd. of Educ.*, Civ. No. 16-587, 2020 WL 278761, at *1 n.2 (D.N.J. Jan. 16, 2020).  A standalone fact without reference to a dispute denotes that the Court has deemed the factual allegation undisputed.

[2] Zeqa does not dispute that the Barnhill Inspection Report made such findings but "does not necessarily agree with the findings of the report."  Pl. Facts ¶ 5.

2.    *The Policy*

The Policy (number HNY D866743) commenced on March 29, 2019 and lasted for one year.  Def. Facts ¶ 8 (citing the Policy at 5-29, 46-50).  The Policy covers, *inter alia*, the dwelling itself (limited to $322,400.00), personal property (limited to $161,200.00), and additional living expenses stemming from the loss of use of the Property (limited to $64,480.00).  *Id.* ¶ 9 (citing the Policy at 5-29, 46-50).  The Policy includes additional coverage for "Fungi, Wet or Dry Rot, Or Bacteria" (limited to $10,000).  *Id.* ¶ 10 (citing the Policy at 32-33, 50).

The Policy insures against, *inter alia*, "direct physical loss to property" for the dwelling itself, "Other Structures" (as defined in the Policy), and "personal property," subject to various exclusions, limitations, and conditions.  *Id.* ¶¶ 11-12 (citing the Policy at 14-19).  The Policy also covers living expenses resulting from the loss of use of the Property "for the shortest time required to repair or replace the damage," and additional coverage for the "reasonable cost incurred . . . for the necessary measures taken solely to protect covered property that is damaged [under certain conditions]."  *Id.* ¶ 13 (citing the Policy at 10-11).  The Policy excludes coverage for losses that are "caused directly or indirectly" by "neglect of an 'insured' to use all reasonable means to save and preserve property."  *Id.* at ¶ 14 (citing the Policy at 17-18).

3.    *The parties disagree on the extent of damage caused by the Incident*

The Property suffered water damage on October 2, 2019, as a result of water discharge from ruptured supply lines feeding accessory bidet attachments mounted on toilets in the second-floor bathroom and first-floor powder room (the "Incident").  Def. Facts ¶¶ 16-17.  The supply lines ruptured as a result of the local Water Authority's seasonal flushing of a fire hydrant, which "sent a pressure hammer through the water supply of the" Property.  D.E. 43-15 ("Oct. 31, 2019 Kaufmann letter to Hanover").  The increased pressure "blew the 'T' fittings" from the upstairs and first floor bathroom supply lines which feed the "bidet-like seat" on the toilet.  *Id.*  The supply

lines spilled water into the house until the damage was discovered approximately three hours later by Zeqa's daughter. *Id.* Zeqa notified Hanover of his claim for damages hours later, whereupon Hanover hired ServPro of Montclair ("ServPro"), to remediate the damage. Def. Facts ¶¶ 21-22 (citing D.E. 43-13 ("Oct. 25, 2019 Hanover letter to Kaufmann" at 2; D.E. 43-17 ("April 2020 Status Report") at 7).

The parties dispute which parts of the Property were damaged by the Incident. Hanover contends that "[w]ater discharge from the first level bathroom would have damaged the first level floor surfaces, the first level lower walls, and would migrate into the basement" and that "[w]ater discharge from the second level bathroom would have damaged the second level floor surfaces, the second level lower walls, and would migrate down to the first level and would damage the first level walls and ceilings," however the "second level upper walls and ceilings would not have been damaged by the water discharge from the second level bathroom." D.E. 43-14 ("Madigan Report") at 5.

Hanover points to three primary sources of evidence to support its position. *First*, the pre-purchase Barnhill Inspection Report finds evidence of pre-existing water damage at the time Zeqa purchased the Property that went uncured by Zeqa. Barnhill Inspection Report; *see* Zeqa Dep. at 63:8-13. According to the report, the Property "had experienced previous long-term moisture exposure." Barnhill Inspection Report. *Second*, an April 2020 Status Report from a claims adjuster reported water damage to (a) the "second-floor bathroom floor, hardwood floors, and lower drywall in the hall and two bedrooms," (b) "the kitchen directly below the second-floor bathroom," (c) "the unfinished bathroom," and (d) "the drywall in the remaining rooms." April 2020 Status Report at 3. The April 2020 Status Report also found "damage to the contents in the first-floor kitchen, bedroom and living room" with "minimal contents damage on the second

floor." *Id.* *Third*, Hanover's litigation expert, Keith C. Madigan, P.E., concluded, *inter alia*, that the "second level upper walls and ceilings would not have been damaged" by the Incident. Madigan Report at 5.

Zeqa, on the other hand, asserts that the damage was more extensive than Hanover claims and required additional remediation work that should have been covered under the Policy, but which Hanover refused to cover. Pl. Facts ¶¶ 28, 39, 42 (citing Policy at 19; D.E. 46-1 ("Opp'n Exhibits") Exs. 3-5; D.E. 43-23 ("Kaufmann Report")). Zeqa disputes the finding of the Madigan Report but does not cite record evidence in his responsive statement of material facts that directly contradicts these findings. *Id.* ¶ 29. Rather, Zeqa notes that Madigan issued his report "over three years after the loss to Plaintiff's home, for the sole purpose of offering an opinion during litigation." *Id.* ¶¶ 30-31. However, Zeqa elsewhere points to (a) moisture readings and photographs taken by Zeqa's remediation company, Quality Air ("QAC"), (b) QAC's estimate to repair the damage, and (c) mold testing it argues is evidence that the work performed by QAC was necessary to remediate the damage from the Incident. *Id.* ¶¶ 32, 41 (citing D.E. 46-1 ("Opp'n Exhibits") Exs. 3-5); D.E. 46 pp. 18-39 ("Opposition" or "Opp'n") at 20.

4.    *The parties disagree on the degree of repairs required to remediate the damage caused by the Incident*

Because the electricity for the Property was switched off after the Incident, ServPro could not utilize its equipment. Def. Facts ¶ 23. At the recommendation of Zeqa's electrician, Zeqa released ServPro before any work was completed. *Id.* ¶ 24 (citing April 2020 Status Report at 7). Zeqa subsequently hired his own remediation company, QAC. *Id.* Hanover claims it did not have prior notice that Zeqa hired QAC, and the remediation work they did was without Hanover's explicit authorization. *Id.* ¶ 27 (citing Oct. 25, 2019 Hanover letter to Kaufmann at 1-4; April 2020 Status Report at 7). Zeqa does not directly dispute that the remediation work was done

5

without Hanover's explicit approval; however, Zeqa does dispute that Hanover had no prior notice of QAC being hired because according to him, a representative from QAC called Hanover's general agent the day they were hired.[3]  Pl. Facts ¶ 27 (citing Opp'n Exhibits Ex. 1 at 21).  QAC then "gutted the interior walls, ceilings and floors and removed and discarded all of the personal property in the Dwelling."  Def. Facts ¶ 25 (citing April 2020 Status Report at 7; Zeqa Dep. at 83:20-25 to 84:1-4).

The parties dispute how much of QAC's work was necessary to remediate water damage from the Incident.  Hanover asserts QAC provided an inaccurate assessment of the water damage, and that the moisture reading results were "unreliable" because the QAC representative could not confirm they were calibrated as required by the "device manufacturer."  Def. Facts ¶ 26, 31. Hanover contends the work QAC performed caused "(1) emergency mitigation costs in excess of what Hanover had estimated; (2) a permanent reconstruction estimate from Plaintiff larger in quantum and scope than Hanover had estimated; (3) a Contents estimate from Plaintiff that included the entirety of all personal property that Plaintiff claimed was in the home; and (4) a loss of use claim from Plaintiff that included additional living expenses beyond the time period that Hanover's adjuster concluded was necessary to perform only the water remediation and repairs required to address the direct physical loss caused by the Incident."  Def. Facts ¶ 28 (citing D.E. 43-16 ("Kaufmann Estimate"); April 2020 Status Report at 6-8; D.E. 43-19 ("Contents Inventory List"); Oct. 31, 2019 Kaufmann letter to Hanover).

---

[3] Zeqa denies that QAC completed the remediation work without Hanover's authorization by pointing to a document where a purported Hanover representative documented that he was aware Zeqa was using QAC as a remediation company and that he had received a phone call from Klodian Belegu of QAC who confirmed the representative's understanding of the Incident.  Pl. Facts ¶ 27 (citing Opp'n Exhibits, Ex. 1 at 24).

At bottom, Hanover contends that excess damage was caused by QAC's unauthorized and alleged unnecessary work.  Def. Facts ¶ 32 (citing Madigan Report at 4).

Zeqa contends that all work performed by QAC was necessitated by the Incident, not as a result of QAC's gutting of the Property.  Kaufmann Report; *see generally* D.E. 43-18 ("QAC Rep. Dep.").  Zeqa acknowledges that QAC gutted the interior without approval but claims that Hanover's prior approval was not required and that the work performed was "necessary work to mitigate the damage to the Property . . . as is required under the Policy."  Pl. Facts ¶¶ 25, 28.

>       5.      *Losses covered by Hanover*

Hanover paid Zeqa a total of $100,280.55.[4]  *See* Def. Facts ¶ 36.  This figure is made up of (1) $49,380.67 for the "direct physical loss to the Dwelling caused by the breakage of the water supply lines"; (2) $18,000 for "direct physical loss to Contents (personal property) caused by the Incident"; and (3)  $32,899.88 for "additional living expenses during the time [Hanover] estimated it would take to repair the direct physical damage to the Dwelling."  *Id.* (citing D.E. 43-21 ("Claim Payment Summary") at 2-3; April 2020 Status Report 5-8).

Additionally, Hanover offered Zeqa a check for $19,419.02 to cover "emergency water mitigation"; however, QAC rejected the payment as "inadequate,"  claiming that it did not justify the amount of work done.  *Id.* (citing QAC Rep. Deposition at 165:22-166:10).  Hanover also committed an additional $18,000 "replacement cost holdback for damage to the dwelling itself" to be released once the repairs or replacement of the "Dwelling damage" are completed.  Def. Facts ¶ 37 (citing Policy at 19-20).  Zeqa claims that the $18,000 should have already been paid because once he provides "proof that work has been performed for an amount greater than or equal to

---

[4] Both Hanover and Zeqa state that the total paid is $100,280.64.  Def. Facts ¶ 36; Pl. Facts ¶ 36. However, after adding the components of that total sum, the Court comes up with a slightly different number of $100,280.55.

[Hanover's] estimate of repairs, then [Hanover] must release those funds" and that Zeqa had produced evidence of QAC's work prior to this litigation commencing. Pl. Facts ¶¶ 37-38 (citing Policy at 19-20, Opp'n Exhibits Ex. 8).[5]  However, Zeqa admits that the repair work has not been completed. Pl. Facts ¶ 39.

### B.    Procedural Background

Zeqa filed the Complaint in Superior Court of New Jersey on March 19, 2021.  Compl. at 1.  The Complaint alleges two counts: breach of an insurance contract (Count I) and insurer bad faith (Count II).  *Id.*  Hanover removed the case to this Court on April 23, 2021 "on the basis of federal diversity jurisdiction."[6]  D.E. 1 at 1.  On May 14, 2021, Hanover answered.  D.E. 6. Following discovery, Hanover now moves for partial summary judgment only on the bad faith claim (Count II).  Mot.  Zeqa opposes.  Opp'n.  Hanover replies.  D.E. 47 ("Reply").

## II.    HANOVER IS ENTITLED TO SUMMARY JUDGMENT ON ZEQA'S BAD FAITH CLAIM

### A.    Legal Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute

---

[5] Zeqa's Response to Hanover's Statement of Undisputed Material Facts splits the response to Paragraph 37 of Hanover's statement over two paragraphs: paragraphs 37 and 38.  Thereafter, Zeqa's response is misaligned by one number such that paragraphs 38 and greater in Zeqa's response appear to correspond to the prior numbered paragraph in Hanover's statement.

[6] The Court is satisfied that diversity jurisdiction exists.  Zeqa is a New Jersey citizen.  Compl. at 1.  Hanover is a Massachusetts citizen.  D.E. 1 ¶ 4.  Additionally, although the Complaint does not allege a monetary value for the amount in controversy, Zeqa submitted a proof of loss alleging a claim in the amount of $439,501.98, D.E. 1-2, therefore, the amount in controversy is over $75,000 for purposes of diversity jurisdiction.  *See* 28 U.S.C. § 1332.

is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment,"[7] *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), and statements of undisputed material facts may not "primarily rely on speculation and legal conclusions" or "fail[] to genuinely dispute the facts[.]" *Buxton v. Dougherty*, 821 F. App'x 70, 71 n.2 (3d Cir. 2020). Furthermore, unsworn allegations in memoranda and pleadings or allegations questioning the credibility of witnesses are insufficient to defeat a properly supported summary judgment motion. *Schoch v. First Fidelity*

---

[7] This rule extends to conclusory self-serving deposition testimony. *See Irving v. Chester Water Auth.*, 439 F. App'x 125, 127 (3d Cir. 2011).

*Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### B.    Analysis

Hanover argues it is entitled to summary judgment on the bad faith claim (Count II) because there is no dispute of material fact that its decision not to provide additional coverage was "fairly debatable."  Mot. at 8.  The Court agrees.  Therefore, the Court will **GRANT** Hanover's motion for summary judgment on Count II.

The "bad faith" cause of action arises under the duty of good faith and fair dealing implicit in all contracts.[8]  *See Pickett v. Lloyd's*, 131 N.J. 457, 467 (1993).  The duty of good faith and fair dealing is that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the full fruits of the contract.'"  *R.J. Gaydos Ins. Agency v. Nat'l Consumer Ins. Co.*, 168 N.J 255, 777 (2001) (quoting *Ass'n Group Life v. Cath. War Veterans*, 61 N.J. 150, 153 (1972)).  In the insurance context, an insurer breaches the duty of good faith if it acts in "bad faith" when reviewing a claim or coverage.  *Pickett*, 131 N.J. at 481.

To prove a claim of insurer bad faith, the insured plaintiff "'must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis.'"  *See id.* at 473 (quoting *Anderson v. Cont'l. Ins. Co.*, 271 N.W.2d 368, 376-77 (Wis. 1978)).  The *Pickett* Court characterized this test as the "fairly

---

[8] Whether framed as an insurer bad faith claim or a claim for breach of the covenant of good faith and fair dealing, under New Jersey law, "these two claims are tantamount to the same cause of action."  *Laing v. AM. Strategic Ins. Corp.*, Civ. No. 14-1103, 2014 WL 4953250 at *2 (D.N.J. Oct. 1, 2014).

debatable" standard and explained that "in the case of denial of benefits, bad faith is established by showing that no debatable reasons existed for denial of the benefits." *Id.* at 473, 481.

In the summary judgment context, if there is a dispute of material fact as to whether the denial of benefits was a breach of the insurance contract, it follows that there are at least fairly debatable reasons for denying the benefits and the insurer will be entitled to summary judgment on the bad faith claim. *See Feit v. Great-West Life and Annuity Ins. Co.*, Civ. No. 03-2948, 2005 WL 2665736, at *7 (D.N.J. Oct. 18, 2005) (citing *Tarsio v. Provident Ins. Co.*, 108 F. Supp. 2d 397, 401 (D.N.J. 2000)); *see also Pickett*, 131 N.J. at 473 ("Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim.").

Here, there is a dispute, grounded in record evidence, regarding Zeqa's entitlement to additional coverage from Hanover. Therefore, under the "fairly debatable" standard, Hanover is entitled to summary judgment on the bad faith claim. *See Pickett*, 131 N.J. at 473; *Feit*, 2005 WL 2665736, at *7. Zeqa does not squarely address the controlling "fairly debatable" standard in his Opposition. Instead, Zeqa argues that Hanover is withholding coverage owed to Zeqa and that Hanover misrepresented its rationale behind denying Zeqa's claim for additional coverage. Opp'n at 24-28.

However, at least three sources of evidence create a dispute of material fact regarding Zeqa's entitlement to additional coverage. *First*, Zeqa's own pre-purchase inspection report found evidence of pre-existing water damage such as "warped roof sheathing," "excessive moss or algae growth," hardwood floor coverings "curling around edges at the Living Room, Dining Room, and Bedroom," and "evidence of prior water intrusion in the basement." Def. Facts ¶ 5 (citing Barnhill

Inspection Report at 5-13, 24-32). Zeqa admits that he did not correct any of the issues noted in the pre-inspection report after he took ownership of the Property. *Id.* ¶ 7 (citing Zeqa Dep. at 39:3-12, 63:8-13). A jury is entitled to consider this pre-inspection report in determining whether all the water damage observed by QAC was caused by the Incident or predated it, thus creating a dispute of material fact on the underlying coverage claim.

*Second*, Hanover points to the April 2020 Status Report by Hanover's adjuster finding damage less extensive than claimed by Zeqa. April 2020 Status Report. Although the report concluded that there was damage to (a) the "second-floor bathroom floor, hardwood floors, and lower drywall in the hall and two bedrooms," (b) "the kitchen directly below the second-floor bathroom," (c) "the unfinished bathroom," and (d) "the drywall in the remaining rooms," it also noted "minimal contents damage on the second floor." *Id.* at 3. Furthermore, the report found that the $93,494.48 estimate provided by QAC was for "unnecessary and unreasonable" remediation work because various portions of QAC's work, in the adjuster's view, would not have been caused by water from the Incident. *Id.* at 6. Thus, a jury must determine whether these findings impact Zeqa's entitled to additional coverage he claims in the underlying coverage claim.

The expert report of Keith Madigan provides a *third* source of evidence disputing Zeqa's underlying coverage claim. Madigan Report. Madigan conducted an engineering analysis and assessment and made various conclusions that differ from Zeqa's assertion that all work performed by QAC was necessary to remediate damage caused by the Incident. Madigan's conclusions include, *inter alia*, that the "second level upper walls and ceilings would not have been damaged by the water discharge from the second level bathroom;" the "gut demolition of the entire second level wall and ceiling interior finishes was not necessary due to water damages from the [Incident]"; the Property "suffered from defects and a lack of maintenance prior to the [Incident]";

the "nature of the pre-incident water intrusion was such that it would have been ongoing and continuous depending on daily weather conditions"; and "by failing to adhere to the standard of care for identifying pre-exiting damage and the extent of water damage at the Property, [QAC] demolished and removed extensive materials at the Property that were not damaged by the [Incident]." *Id.* at 5. This expert evidence provides additional grounds to find a dispute on the underlying coverage claim.

Zeqa challenges Hanover's reliance on the Madigan Report since it was prepared for purposes of litigation over three years after the Incident occurred. Opp'n at 27. However, Zeqa does not cite any authority in support of its position that an otherwise admissible expert report cannot be the basis for a genuine issue of material fact at summary judgment. *But see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 795 (3d Cir. 1994) (finding a dispute of material fact based on findings from a litigation expert). Zeqa does not challenge Madigan's admissibility here. Furthermore, the Madigan Report, as described above, highlights material facts at issue for a jury to determine whether Zeqa is entitled to additional coverage.

However, even were the Court not to consider the Madigan Report for purposes of summary judgment, it would not change the outcome here since, as described above, Hanover relies on other evidence disputing Zeqa's underlying claim that existed at the time of Hanover's coverage decision. Additionally, Hanover points to an estimate, dated March 30, 2020, from Edward Wilson, a consultant retained by Hanover to evaluate QAC's estimate. Reply at 6-7 (citing D.E. 47-2). The estimate rejected the costs to mitigate damages caused by the Incident as put forward by QAC. *See id.* A jury could consider the estimate as additional contemporaneous evidence on the issue of whether Hanover properly denied additional coverage. Therefore, multiple sources of evidence create a dispute regarding the underlying coverage claim irrespective

of whether the Madigan Report is considered. There is therefore no genuine dispute that Hanover's denial of the claim at issue was at least "fairly debatable" and Hanover is entitled to summary judgment on the bad faith claim.

## III.    ZEQA'S PUBLIC ADJUSTER EXPERT, KEVIN KAUFMANN, WILL BE PARTIALLY EXCLUDED

### A.    Legal Standard

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), set forth a gatekeeping role for trial courts in admitting expert testimony. Federal Rule of Evidence 702 codifies the *Daubert* standard and embraces a "liberal policy of admissibility," including with respect to expert testimony. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). Rule 702 does not bar an expert witness from testifying so long as "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

To be admissible under Rule 702, expert testimony must satisfy "three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." *Pineda*, 520 F.3d at 244. These factors are often referred to as "qualification," "reliability," and "fit," respectively. *See Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit."). The party proposing the expert witness must show that each prong is satisfied by a preponderance of proof. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

A witness is qualified to provide expert testimony if the witness has "specialized expertise" in the testimony's subject matter. *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also In re Paoli R.R. Yard Pcb Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (affirming rejection of "overly rigorous requirements of expertise" and expressing "satisf[action] with more generalized qualifications"); *Pineda*, 520 F.3d at 244 (finding that a proposed expert witness need not be "best qualified"). The basis of such specialized knowledge "can be practical experience as well as academic training and credentials," but, "at a minimum," the proffered expert must "possess skill or knowledge greater than the average layman." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000).

An expert's opinions are reliable if they "reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000). In *Daubert* the Supreme Court outlined several non-exclusive factors that a court may consider in determining whether "good grounds" support a witness's testimony, including:

> (1) "whether a theory or technique . . . can be (and has been tested)[;]"
> (2) "whether the theory or technique has been subjected to peer review and publication[;]"
> (3) "the known or potential rate of error[;]"
> (4) "the existence and maintenance of standards controlling the technique's operation[;]" and
> (5) Whether the theory or technique has gained "general acceptance."

*Daubert*, 509 U.S. at 593-94. However, the Supreme Court also emphasized that a court's inquiry is "flexible" and relevant factors are case-dependent. *Id.* at 594; *see also Kannankeril v. Terminix Int'l*, 128 F.3d 802, 806-07 (3d Cir. 1997) ("Although these factors are neither exhaustive nor applicable in every case, they provide a convenient starting point . . . .").

For example, in certain cases, the relevant reliability concerns "may focus upon personal knowledge or experience," rather than "scientific foundations," like those listed above. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999); *see also States v. Fernwood Hotel & Resort*, No. 12-cv-0906, 2014 WL 198568, at *3 (M.D. Pa. Jan. 15, 2014) (holding that an expert witness's practical and specialized experience rendered opinions sufficiently reliable despite lack of scientific hypothesis or testable theory); *Crowley v. Chait*, 322 F. Supp. 2d 530, 539 (D.N.J. 2004) (explaining that in nonscientific cases, "the emphasis is placed not on the methodology of the expert testimony, but on the professional and personal experience of the witness").

An expert's opinions meet the "fit" requirement if they "assist the trier of fact." *Paoli*, 35 F.3d at 742-43. When addressing whether an opinion assists the trier of fact, Courts look to "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case." *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)) (internal quotation marks omitted).

If expert opinions are admissible under Rule 702 and *Daubert*, the expert "should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)); *see Kannankeril*, 128 F.3d at 806 ("Admissibility decisions focus on the expert's methods and reasoning; credibility decisions arise after admissibility has been determined.").

## B.    Analysis

Hanover argues that Kaufmann should be excluded under Federal Rule of Evidence 702. Mot. at 19-26. The Court will **PARTIALLY EXCLUDE** Kaufmann. The Court will permit Kaufmann to testify but preclude testimony regarding causation and whether the costs he identified

are covered under the Policy.  The parties will be required to submit a joint redacted copy of Kaufmann's report consistent with this Opinion.

       *1.*     *Kaufmann is qualified*

Hanover argues that Zeqa's public adjuster expert, Kevin Kaufmann, is not qualified to opine on causation or coverage.  Mot. at 19-23.  The Court disagrees.

The "specialized knowledge" required for an expert to be qualified can be "a broad range of knowledge, skills, and training" in the subject matter area.  *Paoli*, 35 F.3d at 741.  Kaufmann has such knowledge, skills, and training.  He has worked as a licensed public adjuster since 1990.  Kaufmann Report at 4-5.  From 1987 to 1989, he worked as a claims adjuster for two insurance companies.  *Id.*

It is common knowledge that the role of an insurance adjuster is to inspect and assess property damage, determine the cause of such damage, and determine the available coverage for such damage under the relevant insurance policies.  Indeed, as Kaufmann explains in his report, he has "investigated hundreds of water damage claims to make determinations as to the cause of damage and the coverage afforded by the insurance company."  *Id.* at 2.  Additionally, Kaufmann has significant education and training in this area.  For example, he has taken courses in building damage restoration and property claims.  *See id.* at 4.

Hanover's argument that Kaufmann should be excluded because he is not an engineer is unpersuasive.  Mot. at 20-21 (citing *Balu v. Cincinnati Ins. Co.*, No. 19-3604, 2021 WL 1427651, at *3 (E.D. Pa. Apr. 15, 2021)).  Kaufmann need only have "skill or knowledge greater than the average layman" to opine on the issues proffered in his report.  *Aloe Coal Co. v. Clark Equipment Co.*, 816 F.2d 110, 114 (3d Cir. 1987).  As discussed above, Kaufmann falls well within this standard.

Despite Hanover's argument to the contrary, *Balu*, a non-binding out-of-district case, holds no different.  In *Balu*, the court found that the proffered expert was not an engineer and did not have experience or expertise in opining on the causation of roof damage.  *See Balu*, 2021 WL 1427651, at *3.  *Balu* relied on *Aloe Coal* when it stated that "expertise at identifying and estimating the cost to repair damage is not expertise at identifying the cause of the damage."  *Id. Balu* does not cast doubt on an expert's qualification to opine on causation who *does* have expertise in identifying the cause of damage.  Here, Kaufmann has the requisite expertise.  Hanover claims, without any support, that "Kaufmann's expertise is limited to evaluating the costs to repair property after it has been damaged, not how the property was damaged in the first place."  Mot. at 21.    But Kaufmann states otherwise and Hanover provides no reason to question that representation.  *See* Kaufmann Report at 2.  Indeed, in *Equinox Properties, LLC v. Harford Mutual Ins. Co.*, No. 21-15929, 2023 WL 5447279, at *3 (D.N.J. Aug. 24, 2023), the court found that public adjusters, like Kaufmann, with the requisite experience, can be qualified as experts on causation.

Hanover also argues that Kaufmann is unqualified because he uses the phrase "sudden and accidental" which, according to Hanover, is not a term that applies to the type of insurance action at issue here.  Mot. at 21.  However, this goes to Kaufmann's credibility, not his qualifications.  If Hanover believes Kaufmann used the wrong term, the proper avenue to attack his credibility is through cross-examination, not exclusion.  *See Mitchell*, 365 F.3d at 244.  Therefore, the Court finds that Kaufmann is qualified to testify on causation and coverage.

        2.    *Kaufmann's opinion on causation is not reliable and would not assist the trier of fact*

However, the Court agrees with Hanover that Kaufmann's causation analysis is unreliable and would be unhelpful to the trier of fact.  Mot. at 23-26.  Therefore, Kaufmann will be precluded

from testifying as to whether the repair work identified in his estimate was necessitated by the Incident.

Kaufman's concludes his opinions by stating, *inter alia*, "given . . . the damages shown in the photos and during my inspection, all of the damages claimed in my estimate are related to [the] singular sudden loss on 10/2/2019 . . . ." Kaufmann Report at 3 (referencing Kaufmann Estimate). However, this conclusion suffers from a glaring methodological flaw Kaufmann admitted to in his deposition.

Prior to Kaufmann's inspection of the Property, QAC had already begun remediation work and had already "gutted" the house. D.E. 43-20 ("Kaufmann Dep.") at 75:7-12. Kaufmann estimated the cost to "put the house back together the way it was before it was remediated" by QAC. *Id.* at 74:17-20. However, Kaufmann admitted that he was unable to determine whether all the portions of the Property that QAC gutted, were in fact damaged, and *needed* to be gutted to repair the damage caused by the water intrusion. *Id.* at 75:13-19. Kaufmann testified as follows:

> Q. Whether certain items needed to be gutted or not gutted, certain items were damaged versus not damaged, that is not something that you were able to determine based upon what you saw and the information that you had at the time of your inspection; is that right?
>
> A. Correct.
>
> . . .
>
> Q. Okay. And you don't know whether the meters that were shown in the photographs were accurately depicting the conditions that were encountered by the remediation company; would that be fair?
>
> A. I have no knowledge of that.

*Id.* at 75:13-19, 88:3-8.

In other words, Kaufmann admitted that there was no basis to opine that the repair work included in his estimate related to the Incident when he could not determine whether the Incident

damaged the portions of the Property that QAC had gutted.  Nevertheless, Kaufmann included all these repairs in his estimate and opined that all the repairs related to the Incident.  *See* Kaufmann Report at 2-3.  Kaufmann's opinion on causation is thus unreliable and unhelpful to the jury in this case.  Therefore, Kaufmann may not opine on whether all the repair work reflected in his estimate was caused by the water intrusion.

> 3.    *Kaufmann may not opine on whether the specific costs at issue here are covered under the Policy*

Hanover also argues that Kaufmann should be precluded from testifying that the loss he identified in his estimate is covered by the Policy because it is an inadmissible legal conclusion.  Mot. at 21-24.[9]  The Court disagrees but nevertheless finds that Kaufmann's opinion that the costs identified in his estimate are covered by the Policy is unreliable and unhelpful to the jury and therefore precluded under Rule 702.

"While Rule 704 allows experts to provide an opinion about the 'ultimate issue' in a case, it prohibits experts from opining about the ultimate legal conclusion or about the law or legal standards." *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) (citing *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006); *United States v. Leo*, 941 F.2d 181, 196-97 (3d Cir. 1991)).  "The rule prohibiting experts from providing their legal opinions or conclusions is 'so well established that it is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle.'" *Casper v. SMG*, 389 F. Supp. 2d 618, 621 (D.N.J. 2005) (quoting *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001)).  As the boundaries of Rule 704 are "often hazy," the Third Circuit has explained that "expert testimony becomes impermissible if the expert's opinion would interfere with the district court's 'pivotal role in

---

[9] Zeqa does not respond to this argument in his Opposition.

explaining the law to the jury.'" *Patrick*, 536 F. App'x at 258 (quoting *Berckeley*, 455 F.3d at 217).

Kaufmann states that he "reviewed the relevant insurance policy language relating to the coverages and exclusions" and opines that "the policy covered water damage as the result of sudden and accidental losses" and that the "singular sudden loss on 10/2/2019 . . . is a covered loss under the policy." D.E. 42-23 ("Kaufmann Report") at 2-3. Kaufmann's opinions do not cross the line into impermissible legal conclusions and are permissible under Rule 704. Kaufmann is not opining on contract or insurance law or legal standards. Nothing in Kaufmann's opinion invades the Court's instructions to the jury as to what the law is. *See T.N. Incorporation, Ltd. v. Fidelity Nat'l Inf. Servs., Inc.*, Civ. No. 18-5552, 2021 WL 5980048, at *16 (E.D. Pa. Dec. 17, 2021) ("[M]ere discussion of contractual terms in an expert report does not render the report inadmissible.")

However, Kaufmann's opinion that all of the costs identified in his estimate are covered under the Policy is inadmissible under Rule 702. As discussed *supra*, Kaufmann's observations and findings from his review and inspection of the Property are permissible areas for testimony that would assist the jury. Kaufmann may even testify as to the types of losses covered under the Policy and whether damage caused by the Incident qualifies as a covered loss. But Kaufmann may not opine on what that damage was and whether the specific costs he identified in his estimate are covered under the Policy.

Kaufmann's opinion determining whether the Policy covers all the costs he identified in his estimate is unreliable and unhelpful to the jury because it relies on his faulty and inadmissible causation opinion. *See supra*. Therefore, Kaufmann must stop short of testifying whether the Policy covered the specific costs he identified.

## IV.    HANOVER HAS NOT MET ITS BURDEN TO EXCLUDE EVIDENCE OF DAMAGES FOR CONTENTS, EMERGENCY REMEDIATION AND ADDITIONAL LIVING EXPENSES

### A.    Legal Standard

Federal Rule of Civil Procedure 26(a) requires parties to voluntarily disclose "a computation of damages claimed by the disclosing party . . . ."  The disclosing party has a continuing duty to supplement or correct such disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ." Fed. R. Civ. P. 26(e).  If a party fails to provide the information required by Rules 26(a) or (e) "the party is not allowed to use that information . . . to supply evidence . . . at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Although "Rule 37 is written in mandatory terms and is designed to provide a strong inducement for disclosure of Rule 26(a) material," "district courts must exercise particular restraint in considering motions to exclude evidence." *Horizon Blue Cross Blue Shield of New Jersey v. Transitions Recovery Program*, No. 10-3197, 2015 WL 1137777, at *3 (D.N.J. Mar. 13, 2015) (cleaned up); *see Paoli*, 35 F.3d at 791-92 ("The Third Circuit has, on several occasions, manifested a distinct aversion to the exclusion of important testimony absent evidence of extreme neglect or bad faith on the part of the proponent of the testimony.").

Courts consider five factors in determining whether to exclude evidence pursuant to Rule 37(c)(1):  "(1) the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case . . . ; [] (4) bad faith or willfulness in failing to comply with a court order or discovery obligation . . . ; [and (5)] the

importance of the excluded evidence." *Mall Chevrolet, Inc. v. General Motors LLC*, No. 18-15077, 2021 WL 426193, at *15 (D.N.J. Feb. 8, 2021) (citing *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298 (3d Cir. 2012)).  "'The burden . . . falls on the moving party to establish that exclusion is the most appropriate remedy.'" *Id.* (quoting *Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 615 (E.D. Pa. 2016)).

### B.    Analysis

Hanover seeks to exclude evidence of Zeqa's contents, emergency remediation and additional living expenses damages under Rule 37 on the grounds that Zeqa failed to disclose these damages pursuant to Rules 26(a) and (e).  Mot. at 27-30.  However, the Court finds that Hanover has not met its burden to show that exclusion of this evidence is the appropriate remedy for the failure to update the damages calculations in the initial disclosures.  Therefore, the Court will **DENY** Hanover's application to exclude such evidence.

Hanover has not adequately explained why it is prejudiced by Zeqa's apparent failure to amend the damages calculations and has not addressed Zeqa's ability to cure such prejudice.  Zeqa points to the depositions of Klodian Belegu, Zach Becker, and himself as discovery that indicated that he would be seeking damages for contents, emergency remediation and additional living expenses.  Opp'n at 37-38.  However, Hanover does not explain why the information contained in these depositions is insufficient to avoid the prejudice it now claims, or even why such information does not qualify as "additional or corrective information" required under Rule 26(e).

Hanover also does not adequately address why it could not recognize the full extent of damages Zeqa is seeking from the QAC and Zach Becker documents Zeqa points to in his Opposition.  Opp'n at 38.  Hanover's assertion that it should not be "expected to read the tea leaves" to understand Zeqa's litigation strategy does not address why it could not, at very least,

seek to clarify the apparently conflicting damages information it received during discovery and when it in fact learned of the relevant damages.  Reply at 14.

Indeed, Hanover is clearly now aware of the damages that Zeqa is seeking, down to the dollar.  It is not clear how Hanover learned of these damages if it is true that it did not have the information necessary to determine the types of damages being sought.  Hanover does not explain this discrepancy.  Hanover admits that it "questioned [Zeqa]" about his pre-litigation claim for contents, emergency remediation or additional living expenses, Mot. at 29, but does not explain when that questioning took place and what Zeqa's response was.  In other words, Hanover does not explain how this questioning did not alert it to the categories of damages Zeqa may seek to introduce evidence on.  Without addressing the specifics of how and when Zeqa learned of the allegedly omitted damage disclosures, it cannot carry its burden to show that it was prejudiced by such omission to the extent warranting exclusion of evidence as a result. [10]  In short, there is much the Court still does not know about the facts underlying Hanover's argument to exclude evidence of contents, emergency remediation and additional living expenses damages.  Therefore, the Court will **DENY** Hanover's motion to exclude such evidence.

## V.    CONCLUSION

For the foregoing reasons, Hanover's Motion will be **GRANTED in part** and **DENIED in part**.  Partial summary judgment will be **GRANTED** in favor or Hanover on Count II and Count II will be **DISMISSED**.

---

[10] Nevertheless, the Court is troubled by Zeqa's apparent failure to properly amend its disclosures. Even accepting Zeqa's representation that the calculation on the initial disclosures was a "clerical error," that does not excuse his obligation to correct the error.  Zeqa has not explained why he failed to abide by this obligation or, instead, that he satisfied its Rule 26(e) obligations.  Evidence of Zeqa's contents, emergency remediation and additional living expenses is clearly important evidence to the extent liability may be found and Zeqa will not be permitted to hide the ball from Hanover.

Zeqa's insurance adjuster expert, Kevin Kaufmann, will be **PARTIALLY EXCLUDED**. Kaufmann will not be permitted to testify as to causation and whether the specific remediation costs he identified are all covered by the Policy.  Kaufmann will otherwise be permitted to testify and the parties will be required to file a jointly redacted copy of Kaufmann's expert report consistent with this Opinion.

The Court will **DENY** Hanover's application to limit evidence of Zeqa's contents, emergency remediation and additional living expenses damages.

Dated: September 9, 2024

Evelyn Padin, U.S.D.J.